**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DONNA BROWN,

Plaintiff,

v.

FRANK REYNOLDS; BILL SMITH; DANIEL HIGGINS; CHARLES MCMAHAN; IRENE RUIZ; MELISSA SHAW; SHELIA JACKSON; DAWN BURKHART; MICHAEL TUROCZY; EVAN LOCKSTEDT; and DOES 1–5,

Defendants.

Civil Action No.

**Jury Trial Demanded**

# COMPLAINT

Plaintiff Donna Brown brings this action against defendants Frank Reynolds, Bill Smith, Daniel Higgins, Charles McMahan, Irene Ruiz, Melissa Shaw, Shelia Jackson, Dawn Burkhart, Michael Turoczy, and Evan Lockstedt (collectively "Defendants") and alleges as follows:

## FACTUAL BACKGROUND

### I. Defendant Lockstedt's Rape of Plaintiff

1. In 2019 and 2020, Plaintiff was an inmate in the Cherokee County Adult Detention Center ("ADC") operated by the Cherokee Sheriff's Office ("CSO").

2. The ADC is a 512-bed detention center housing both pre-trial detainees and convicted inmates.

3. The CSO operates inmate work program at the ADC known as Workforce.

4. The Defendants had responsibility for the design, implementation, and day-to-day operation of Workforce.

5. To incentivize participation, inmates permitted into Workforce receive great benefits, including spending eight or more hours per day outside of the inmate pods, better quality food, and time credited against their sentences.

6. CSO personnel exploited these incentives to use Workforce as part of a widespread, systemic scheme to take advantage of female ADC inmates.

7. During the operation of Workforce, CSO personnel routinely engaged in coerced and forced sexual acts with female ADC inmates.

8. It was well-known among ADC inmates and CSO personnel that CSO officers routinely engaged in coerced and non-consensual sexual acts with the inmates on Workforce.

9. Officers operating the Workforce program would select young, attractive inmates for Workforce.

10. In late September 2020, Defendant Michael Turoczy selected two young women and offered them the opportunity to join Workforce. Knowing the dangers, they refused.

11. Defendant Turoczy then offered Plaintiff the opportunity to join Workforce and she accepted.

12. Plaintiff was assigned to work primarily in laundry, but also delivered food and other items to inmate pods as part of her duties on Workforce.

13. Upon joining Workforce, Plaintiff was moved to a housing pod reserved for Workforce inmates.

14. Plaintiff began hearing from other inmates about the rampant sexual abuse of inmates in the program.

15. Defendant Evan Lockstedt began inappropriately contacting Plaintiff—groping her and rubbing up against her while she was attempting to perform her assigned duties.

16. Plaintiff did not feel comfortable discussing this behavior with CSO personnel because she feared for her well-being and that she would be removed from Workforce.

17. One day in approximately October 2020 Defendant Lockstedt instructed Plaintiff to accompany him to retrieve some canned food items from a stockroom in the ADC.

18. The stockroom was located behind the ADC's kitchen and laundry room near an office for food service operations. This area of the ADC was under construction at the time and known to not have active surveillance cameras.

19. In the stockroom, Defendant Lockstedt forcibly, violently raped Plaintiff, causing a severe laceration among other injuries.

20. Defendant Lockstedt expressly threatened to kill Plaintiff if she ever told anybody about the rape.

## II. The CSO's Customs, Policies, and History of Widespread Sexual Abuse

21. Rape, sexual battery, and coerced sexual acts with female ADC inmates was rampant, routine, and widespread throughout the ADC, particularly in connection with the Workforce program.

22. During Plaintiff's time in the ADC numerous other women were raped or sexually assaulted by CSO employees and coerced into performing sexual acts for CSO employees.

23. Plaintiff was aware of at least six female ADC inmates who were physically sexually assaulted by CSO officers during Plaintiff's time in the ADC.

24. Prior to Plaintiff's rape, Plaintiff's roommate, referred to here as "Jane Doe 1," was sexually assaulted by a CSO officer.

25. Plaintiff personally knew another inmate, referred to here as "Jane Doe 2," who was coerced into having sex with CSO officers on numerous occasions.

26. Plaintiff personally knew another inmate, referred to here as "Jane Doe 3," who was forced to perform oral sex with a CSO officer on at least one occasion.

27. The sexual abuse of inmates was well-known throughout the ADC. It was a common topic of discussion among both ADC inmates and CSO personnel.

28. Each of the Defendants, among other CSO personnel, had actual knowledge of the widespread sexual abuse of female ADC inmates.

29. Due to the widespread, pervasive nature of the sexual abuse in the ADC, all CSO personnel who worked at the ADC or had any responsibility for the

operation of the ADC knew about the sexual abuse of inmates. In particular, for example:

a. Defendant Jackson behaved as if the sexual abuse was the inmates' fault and warned female inmates to avoid being alone or interacting with the male CSO officers.

b. Jane Doe 1 reported her sexual assault directly to Defendants Jackson and Turoczy who did nothing about it.

c. Jane Doe 1's sexual assault was reported to senior CSO leadership, including, among others, defendants Reynolds, Smith, Higgins, McMahan, and Ruiz.

d. Defendant Turoczy facilitated and participated in the sexual abuse of inmates by selecting inmates for Workforce who the male officers perceived as sexually attractive and, therefore, sought the opportunity to sexually assault.

e. Plaintiff personally overheard a conversation while working in the laundry room in which defendants Higgins, Ruiz, and Shaw expressly told Jane Doe 2 that she would be removed from Workforce if she told anyone about her sexual abuse by CSO officers. It was clear from this

conversation that the Defendants were not only aware of the widespread sexual abuse of inmates, but also experienced in covering it up.

f. Plaintiff personally overheard CSO Deputy Amy Darling and Deputy Dutton discussing the sexual abuse of inmates in the ADC.

g. The jail chaplain, known to Plaintiff as Mr. Buntz, warned the inmates about sexual abuse and tried to help them protect themselves from it.

h. Defendant Burkhart, the ADC's Prison Rape Elimination Act Coordinator, knew of rampant sexual abuse but did nothing, failed to investigate or follow up on reports of sexual abuse, and attempted to avoid the victims and female inmates.

i. Plaintiff witnessed male CSO officers coming and going from female inmate's rooms during the middle of the night when there was no legitimate purpose for the officers to be in the inmate's rooms.

30. In June 2019, CSO Deputy Richard Gilleland was arrested and charged with sexually assaulting two inmates in the ADC.

31. Deputy Gilleland was charged with two counts of sexual assault against a person in custody, two counts of sexual battery, and two counts of violation of oath of office.

32. In fact, Deputy Gilleland sexually assaulted many more than two inmates in the ADC.

33. Furthermore, Deputy Gilleland was just one of many CSO officers who engaged in sexual assault of female ADC inmates.

34. Although Gilleland was removed from the CSO in June of 2019, the custom, policy, and culture that allowed and encouraged widespread, pervasive sexual abuse at the ADC continued.

35. Senior CSO leadership, including Defendants Reynolds, Smith, Higgins, McMahan, and Ruiz received numerous reports of inmate sexual abuse by other ADC personnel.

36. The senior CSO leadership, including Defendants Reynolds, Smith, Higgins, McMahan, and Ruiz, nonetheless failed to undertake any appropriate investigation, make policy changes, or make changes to customs to eliminate the rampant sexual abuse of inmates.

37. CSO supervisors, including defendants Frank Reynolds, Bill Smith, Daniel Higgins, Charles McMahan, Irene Ruiz, Melissa Shaw, Shelia Jackson, Dawn Burkhart, Michael Turoczy had actual knowledge of reports of sexual of inmates by defendant Evan Lockstedt.

38. Eventually, defendant Lockstedt was forced to leave the CSO, but the Defendants kept his crimes concealed allowing defendant Lockstedt to remain in law enforcement, joining the Holly Springs Police Department.

39. In 2021, an investigation conducted by local news organization 11Alive found that the CSO routinely chooses not to investigate or pursue allegations of rape reported to the Office. *See* Kristin Crowley, 'We made some mistakes' | New policies, training coming to Cherokee Co. following investigation into unsolved rapes, 11Alive (Dec. 8, 2021, 11:01 PM), https://www.11alive.com/article/news/investigations/the-reveal/cherokee-county-rape-investigation-new-policies/85-472465a4-4a50-474d-a0dc-d43fdf8eff20.

40. Multiple victims stated that the CSO essentially ignored their reports of being raped. One such victims explained that rape is "not really a crime in their book." *Id.*

41. Following the media attention, the CSO claimed to implement new policies regarding investigations into sexual assaults and stated an intention to review prior reports of sexual assaults made to the Office that were not appropriately investigated originally.

## JURISDICTION AND VENUE

42. This Court has jurisdiction over each Defendant because they are domiciled in the State of Georgia and/or acted and caused injury within the State of Georgia.

43. This Court has jurisdiction over the subject matter of this action because it asserts claims arising under the Constitution and laws of the United States. The Court has supplemental jurisdiction over Plaintiff's state law claims because they are so closely related to Plaintiff's federal claims that they form part of the same case or controversy.

44. Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1331 and Local Rule 3.1 because a substantial part of the events giving rise to the cause of action occurred in Cherokee County, Georgia, which is situated in the district and divisional boundaries of the Atlanta Division of the Northern District of Georgia.

## PARTIES

45. Plaintiff Donna Brown is a resident of the state of North Carolina.

46. Defendant Frank Reynolds was the Sheriff of Cherokee County at all times relevant to this complaint. At all relevant times, Defendant Reynolds acted under color of state law and as an official policymaker responsible for (1) the

policies, practices, customs, and regulations of the Cherokee County Sheriff's Office, (2) all operations of the ADC, and (3) the hiring, training, supervision, and discipline of all CSO employees.

47. Defendant Bill Smith was the Major, Jail Operations for the CSO at all times relevant to this complaint. Defendant Smith acted under color of state law, within the course and scope of his employment by the CSO, and as an official policymaker responsible for, among other things (1) the operations, policies, practices, customs, and regulations of the ADC, and (2) the hiring, training, supervision, and discipline of all ADC employees.

48. Defendant Daniel Higgins was the Captain, Adult Detention Center for the CSO at all times relevant to this complaint. At all relevant times, Defendant Higgins acted under color of state law, within the course and scope of his employment by the CSO, and as an official policymaker responsible for, among other things (1) the operations, policies, practices, customs, and regulations of the ADC, and (2) the hiring, training, supervision, and discipline of all ADC employees.

49. Defendant Charles McMahan was the Captain, Adult Detention Center Planning and Programming for the CSO at all times relevant to this complaint. At all relevant times, Defendant McMahan acted under color of state

law, within the course and scope of his employment by the CSO, and as an official policymaker responsible for operation of ADC programs, including the Workforce program, among other things.

50. Defendant Irene Ruiz was a Lieutenant Shift Supervisor for the CSO employed at the ADC at all times relevant to this complaint. At all relevant times, Defendant Ruiz acted under color of state law and within the course and scope of her employment by the CSO. Defendant Ruiz was responsible for, among other things, supervising the operations of the ADC and the implementation of policies, practices, customs, and regulations of the CSO by her subordinates.

51. Defendant Melissa Shaw was a Lieutenant Shift Supervisor for the CSO employed at the ADC at all times relevant to this complaint. At all relevant times, Defendant Shaw acted under color of state law and within the course and scope of her employment by the CSO. Defendant Shaw was responsible for, among other things, supervising the operations of the ADC and the implementation of policies, practices, customs, and regulations of the CSO by her subordinates.

52. Defendant Shelia Jackson was a Sergeant, Adult Detention Center Programs Manager for the CSO at all times relevant to this complaint. At all relevant times, Defendant Jackson acted under color of state law and within the course and scope of her employment by the CSO. Defendant Jackson was

responsible for, among other things, supervising the operations of the ADC programs, including the Workforce program.

53. Defendant Dawn Burkhart was a Sergeant, PREA Coordinator for the CSO employed at the ADC at all times relevant to this complaint. At all relevant times, Defendant Burkhart acted under color of state law and within the course and scope of her employment by the CSO. Defendant Burkhart was responsible for, among other things, preventing and investigating sexual abuse of ADC inmates, including ensuring the ADC's compliance with the laws, rules, and regulations concerning the Prison Rape Elimination Act.

54. Defendant Michael Turoczy was a CSO Sergeant employed at the ADC at all times relevant to this complaint. At all times relevant to this complaint, Defendant Turoczy acted under color of state law and within the course and scope of his employment by the CSO.

55. Defendant Evan Lockstedt was a CSO Deputy employed at the ADC at all times relevant to this complaint. At all times relevant to this complaint, Defendant Lockstedt acted under color of state law and within the course and scope of his employment by the CSO.

56. Doe defendants 1 through 5 are CSO personnel not otherwise named above who (1) were responsible for promulgating and enforcing, or in fact did

promulgate and enforce, customs, practices, policies, and procedures applicable to the operation of the ADC; (2) were responsible for hiring, training, supervising, retaining, and/or disciplining Defendant Lockstedt; or (3) had actual knowledge of a history of widespread abuse that put them on notice of the need to correct the constitutional deprivation and failed to do so. Plaintiff does not have personal knowledge of, and despite reasonable diligence has been unable to discover, the true identities of Does 1 through 5 prior to litigation.

## CLAIMS FOR RELIEF

**Count I: Violation of Fourth, Eighth, and Fourteenth Amendment pursuant to 42 U.S.C. § 1983 by Defendant Evan Lockstedt**

57. Plaintiff incorporates paragraphs 1 through 56.

58. Plaintiff had a Fourteenth Amendment, right to bodily integrity, a Fourth Amendment right to be free from unnecessary acts of violence during the pendency of a seizure, and an Eighth Amendment right to be free from cruel or unusual punishment.

59. Sexual abuse by a state actor against a person in custody can never serve a legitimate purpose and, therefore, is malicious and sadistic by definition.

60. As such, Defendant Lockstedt's actions violated Plaintiff's constitutional rights.

61. As a direct and proximate result of Defendant Lockstedt's violations of Plaintiff's constitutional rights, Plaintiff suffered physical injury and emotional pain and suffering.

**Count II: Assault and Battery Under Georgia State Law by Defendant Lockstedt**

62. Plaintiff incorporates paragraphs 1 through 56.

63. Defendant Lockstedt committed assault and battery against Plaintiff in violation of O.C.G.A. §§ 51-1-13 and 51-1-14.

64. Defendant Lockstedt's assault and battery directly and proximately caused Plaintiff physical injury and emotional pain and suffering.

65. Defendant Lockstedt's attack on Plaintiff was intentional, malicious, and carried out with an intent to cause Plaintiff harm.

66. Accordingly, Defendant Lockstedt's conduct was not protected by official immunity and he is liable to Plaintiff for assault and battery.

**Count III: Violation of Fourth, Eighth, and Fourteenth Amendment pursuant to 42 U.S.C. § 1983 by Defendants Frank Reynolds, Bill Smith, Daniel Higgins, Charles McMahan, Irene Ruiz, Melissa Shaw, Shelia Jackson, Dawn Burkhart, and Michael Turoczy**

67. Plaintiff incorporates paragraphs 1 through 56.

68. Defendants Frank Reynolds, Bill Smith, Daniel Higgins, Charles McMahan, Irene Ruiz, Melissa Shaw, Shelia Jackson, Dawn Burkhart, and

Michael Turoczy (the "Count III Defendants") were responsible for, among other things:

a. The day-to-day operations of the ADC;

b. Hiring, training, monitoring, supervising, retaining, and disciplining ADC personnel, including Defendant Lockstedt;

c. The promulgation, implementation, and continued operation of ADC policies, customs, and practices.

69. Among other things, the Count III Defendants:

a. Engaged in, promulgated, and enforced customs, practices, policies, and procedures that proximately caused Plaintiff's constitutional deprivations;

b. Had actual knowledge of a history of widespread abuse that put him on notice of the need to correct the constitutional deprivations and failed to do so; and

c. Knew that ADC personnel, including Defendant Lockstedt, had and would continue to act unlawfully and failed to stop them from doing so.

70. The Count III Defendants were deliberately indifferent to the constitutional rights of ADC inmates, including Plaintiff. Accordingly, the Count

III Defendants, in their individual capacities, have supervisory liability under 42 U.S.C. § 1983 for Plaintiff's constitutional deprivations.

71. As a direct and proximate result of The Count III Defendants' constitutional violations, Plaintiff suffered physical injury and emotional pain and suffering.

## PUNITIVE DAMAGES AND ATTORNEYS' FEES

72. Defendants' actions were willful, deliberate, and in reckless disregard of Plaintiff's constitutional rights.

73. Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

74. Accordingly, punitive damages should be imposed against Defendants pursuant to O.C.G.A. § 51-12-5.1 and other applicable laws to deter future violations of fundamental constitutional rights.

75. Defendants have acted in bad faith, have been stubbornly litigious, and/or have caused Plaintiff unnecessary trouble and expense, which entitle Plaintiff to punitive attorneys' fees and expenses of litigation from both defendants pursuant to O.C.G.A. § 13-6-11.

76. Plaintiff is additionally entitled to attorneys' fees pursuant to 42 U.S.C. § 1988.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays that this Court award the following relief from Defendants:

a. An award of compensatory damages for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b. An award of punitive damages in favor of Plaintiff;

c. An award of reasonable costs and attorneys' fees from all defendants; and

d. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

**DATED**: July 28, 2022.

/s/Eric S. Fredrickson
Eric S. Fredrickson
Georgia Bar No. 489783
Matthew S. Harman
Georgia Bar No: 327169

**HARMAN LAW FIRM LLC**
3575 Piedmont Road, NE
Bldg 15, Suite 1040
Atlanta, GA 30505
Telephone: (404) 554-0777
Facsimile: (404) 424-9370
Email: mharman@harmanlaw.com
efredrickson@harmanlaw.com

***Attorneys for Plaintiff***